CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
8/16/2021
JULIA C. DUDLEY, CLERK
BY: s/ A. Little
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| DIONNE S.[1], | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )  Civil Action No. 6:20-cv-12 |
| | ) |
| KILOLO KIJAKAZI,[2] | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

Plaintiff Dionne S. ("Dionne") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for Supplemental Security Income ("SSI") under the Social Security Act ("Act").[3] 42 U.S.C. §§ 1381–1383f. Dionne alleges that the Administrative Law Judge ("ALJ") erred by failing to properly weigh her treating physician's opinion. I agree that the ALJ's decision is not supported by substantial evidence. Accordingly, I **GRANT in part** Dionne's Motion for Summary Judgment, **DENY** the Commissioner's Motion for Summary Judgment, and **REMAND** this matter for further administrative consideration.

## STANDARD OF REVIEW

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is hereby substituted for Andrew Saul as the defendant in this case.

[3] This case is before me by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Dionne failed to demonstrate that she was disabled under the Act.[4] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). However, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess [at] how the ALJ arrived at his conclusions"); see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often) (citations omitted).

## CLAIM HISTORY

---

[4] The Act defines "disability" for a claimant under the age of eighteen for purposes of eligibility for SSI payments if he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). "Disability" for a person over age eighteen is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Dionne filed for SSI in October 2016, claiming her disability began on October 13, 2016 due to twenty-five medical conditions.[5] R. 45, 211–21, 247. The state agency denied Dionne's applications at the initial and reconsideration levels of administrative review. R. 104–24, 125–58. On July 11, 2019, ALJ Theodore Kennedy held a hearing to consider Dionne's claim for SSI. R. 42–74. Counsel represented Dionne at the hearing, which included testimony from vocational expert Linda Oggin. On August 1, 2019, the ALJ entered his decision analyzing Dionne's claim under the familiar five-step process[6] and denying her claim for benefits. R. 14–41.

The ALJ found that Dionne suffered the severe impairments of migraines, right shoulder rotator cuff tear, bilateral carpal tunnel syndrome, obesity, generalized anxiety disorder, major depressive disorder, and bipolar disorder. R. 19. The ALJ determined that these impairments, either individually or in combination did not meet or medically equal a listed impairment. R. 20. The ALJ specifically considered listing 1.02 (major joint dysfunction), 11.02 (epilepsy), 12.04 (depressive, bipolar, and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders). R. 20–21. The ALJ also considered Soc. Sec. Ruling 19–2 Titles II and Xvi: Evaluating Cases Involving Obesity, SSR 19–2p, 2019 WL 2374244 (S.S.A. May 20, 2019). The ALJ found that regarding her mental impairments, Dionne had moderate limitations in

---

[5] Dionne originally claimed her disability began in July 2012, but she amended her alleged onset date to her date of filing at the administrative hearing. R. 45.

[6] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

understanding, remembering, or applying information, concentrating, persisting, or maintaining pace, and interacting with others and no limitation in adapting or managing herself. R. 21–22.

The ALJ concluded that Dionne retained the residual functional capacity ("RFC") to perform a limited range of light work. R. 22–23. Specifically, Dionne can frequently lift and carry 25 pounds and occasionally lift and carry 50 pounds. Id. She can frequently reach overhead, reach in all other directions, and handle, finger, feel, push or pull with her hands bilaterally. Id. She can sit, stand, and walk for about six hours in an eight-hour day, and she can frequently climb stairs and ramps and frequently balance, stoop, kneel, crouch, or crawl. Id. Dionne can never climb ladders, ropes, or scaffolds, and she cannot be exposed to unprotected heights, though she could occasionally be exposed to moving mechanical parts. Id. She would be limited to understanding, remembering, and carrying out short, simple instructions that are required to perform routine, repetitive tasks. Id. She can maintain attention, concentration, and pace to perform such tasks within all required parameters, and she could have frequent interaction with supervisors and coworkers but only occasional interaction with the public. Id.

The ALJ determined that Dionne had no past relevant work, but that she could perform jobs that exist in significant numbers in the national economy, such as price marker, photocopying machine operator, and routing clerk. R. 28–29. Thus, the ALJ determined that Dionne was not disabled. R. 29. Dionne appealed the ALJ's decision and the Appeals Council denied her request for review on January 21, 2020. R. 1–4.

A. **Medical History Overview**

1. Medical Treatment

Throughout the relevant period, Dionne complained of many varied physical conditions.[7] Dionne's primary complaints throughout the relevant period related to various neck, back, hand, shoulder, and other musculoskeletal pain. In early 2017, Dionne attended an appointment with her pain management provider, Susan Sherwood, NP–A. R. 2209. Dionne reported pain in her neck, back, shoulder, and extremities and was assessed with chronic neck pain radiating to her right upper extremity and carpal tunnel. R. 2212. Dionne reported some relief from medication and other than some tenderness, her physical exam was generally normal. Dionne continued to follow-up with Ms. Sherwood with similar complaints and physical examination results throughout the relevant period.

In February 2017, Dionne reported to the emergency room after she was injured in a car accident, complaining of back pain and chest palpitations. R. 2404. Physical exam revealed some tenderness in Dionne's back, but otherwise she had no tenderness and a normal range of motion in her extremities. The treating doctor diagnosed her with strain of her thoracic paraspinal muscles and instructed her to follow-up with her primary care provider. As a result of this accident, Dionne began a course of physical therapy. R. 4631–50. On initial evaluation, Dionne was diagnosed with pain in both shoulders and generalized muscle weakness, and her physical therapist noted strength and range of motion deficits in her upper extremities. R. 4631–50. Dionne was discharged from physical therapy after several weeks due to noncompliance. As part

---

[7] Dionne's complaints during the relevant period were generally musculoskeletal in nature. Prior to the relevant period, Dionne had an ileal carcinoid tumor removed. Throughout the relevant period, Dionne followed up regularly with her oncologist, William Grosh, M.D., for check-ups related to the removed tumor and for wide-ranging concerns including abdominal pain and H. pylori infection. Dionne occasionally attended cardiology appointments between 2016 and 2019 and reported to the emergency room several times complaining of chest pain. Providers deemed Dionne at moderate risk for cardiac events, however, her EKGs and other physical exams revealed generally normal cardiac function. In addition to physical complaints, Dionne also consistently treated for mental health concerns with Horizon Behavioral Health and she attended evaluation and management visits several times each year. Dionne's mental status examinations were generally normal, though she did experience some abnormalities in mood, affect, and insight. See, e.g., R. 2655, 2662, 2667, 4301.

of the discharge note, Dionne's physical therapist noted that while she suffered some continuing weakness and difficulty pushing and lifting, she did experience objective improvement. R. 4648–50.

Dionne continued to complain of neck and back pain at appointments with her primary care physicians and pain management provider throughout 2017. See R. 2207, 2737, 2974. In September 2017, Dionne complained of neck pain with treating provider Shveta Tiwari, M.D. R. 2970. Dr. Tiwari found Dionne had decreased and painful range of motion in her shoulder and recommended an ultrasound. R. 2972. The ultrasound was negative for masses. R. 3217.

In December 2017, Dionne attended an orthopedic appointment for evaluation of right shoulder pain. R. 3224. Her orthopedist assumed Dionne suffered a muscle strain, noting that there was no evidence of fracture or degenerative changes. While Dionne's shoulder was tender, physical exam revealed full range of motion and 5/5 strength. Her orthopedist recommended physical therapy and medication. Dionne then began a course of physical therapy. On initial evaluation, Dionne had reduced range of motion and decreased strength; after several appointments, Dionne's provider observed that she made therapeutic gains, however, she self-discharged from the course of treatment.

In February 2018, Dionne was referred to physical therapy for a functional assessment. R. 4671. On exam, the physical therapist found that Dionne was moderately impaired in her upper extremities, noting impairments in her proximal and cervical range of motion and grip strength. The physical therapist found less lower extremity limitations, noting that testing revealed Dionne's lower extremities were generally within the functional standards.

Dionne occasionally complained of neck and back pain at later 2018 appointments, and in August 2018, Dr. Tiwari referred Dionne for physical therapy. See R. 4364, 4730–33. Dionne

began a course of physical therapy in September 2018. On initial evaluation, Dionne had decreased range of motion and decreased upper extremity strength. R. 4678. At discharge, Dionne's physical therapist noted Dionne met or partially met all goals and that she gained some mobility and upper extremity strength on the right, though she still had some weakness. R. 4681–714.

In November 2018, Dionne complained of continuing right-sided shoulder and neck pain. R. 4725. Dionne then reported to the emergency room in December 2018, complaining of similar symptoms. R. 4610. On exam, Dionne had some back tenderness and pain, but full range of motion and no tenderness throughout her extremities and neck. R. 4610–11. Her treating doctor assessed her with right torticollis (tight neck muscles) and she was advised to rest and take medication as needed. R. 4611.

Dionne continued to complain of back, shoulder, and other musculoskeletal pain at several appointments in 2019. See R. 4784, 4810, 4836. At these appointments, Dionne had generally normal physical exams. X-rays and exams of her back revealed only mild degenerative changes and full range of motion, but some pain and tenderness. R. 4784, 4810. She also had normal gait and station and 5/5 strength in her lower extremities. Dionne was referred to physical therapy for her back pain. R. 4810.

Dionne also complained of migraines throughout the relevant period. In December 2016, Dionne presented to the emergency room complaining of arm numbness, headache, and chest pain. R. 2782. Dionne's treating doctor diagnosed her with headache. R 2794. In January 2017, Dionne treated with Myla Goldman, M.D., complaining of several recent and severe headaches. R. 2245–46. Dr. Goldman diagnosed her with chronic daily migraine, which she planned to treat through medication. R. 2250. Dionne continued complaining of headaches at several

appointments in 2017 and providers typically recommended medication and other conservative measures. See, e.g., R. 2461, 2737. In January 2018, Dionne presented to the emergency room complaining of headaches, and she was diagnosed with slurred speech, numbness, and tingling. Her MRI results were normal. R. 3249, 4145. Dionne complained of headache again in February 2018. Her physical and neurological exams were unremarkable, but her medication was adjusted. Dionne continued to complain of headaches, and her providers continued to treat her with medication. R. 4255, 4362–64, 4836.

2. Medical Opinions

In February 2016, Joyce Huerta, M.D., completed a Virginia Department of Medical Assistance Services form. R. 4445. She diagnosed Dionne with wrist pain and concluded that Dionne had limited mobility but did not have restricted activity or require assistance with her activities of daily living. Id. The ALJ gave Dr. Huerta's opinion little weight as to her conclusion regarding Dionne's ability to ambulate but gave it great weight as to all other conclusions. R. 28.

In January 2017, Juliana Frosch, PMHNP, completed a mental capacity evaluation. R. 2158–60. Ms. Frosch found Dionne had no to only slight limitations in understanding and memory and social interaction, no to moderate limitations in adaptation, and slight to extreme limitations in sustained concentration and persistence. Id. The ALJ assigned Ms. Frosch's opinion little weight. R. 27.

In January 2016, February 2017, and June 2017, Teodora Brose, M.D., one of Dionne's treating physicians, authored three medical opinions. R. 495–96, 2630–31 (January 2016 opinion); R. 2174 (February 2017 opinion); R. 2345–46, 2443–44 (June 2017 opinion). In 2016, Dr. Brose found that Dionne's symptoms would often interfere with her attention and concentration and that she would need to take very frequent, unscheduled breaks. R. 2345–46.

She also found that during an eight-hour workday Dionne could not sit and only stand or walk up to one hour in an eight-hour workday. Id. She further found that Dionne could only occasionally lift or carry less than 10 pounds and that she had manipulative restrictions and could only use her hands and fingers for 25% of the day and use her arms for 10% of the day. Id. She concluded that Dionne would miss more than four days of work per month. R. 495–96. In February 2017, Dr. Brose completed a certificate of health stating that Dionne could perform "work that is not physical in nature for less than [two hours] per day if frequent breaks would be allowed." R. 2174. In June 2017, Dr. Brose completed a medical evaluation form from the Virginia Department of Social Services, concluding that Dionne cannot lift more than 15 pounds and had difficulty lifting over her head. Id. She found Dionne could participate in employment for up to 19 hours per week. Id. The ALJ gave Dr. Brose's opinions little weight except to the extent that they reached conclusions on issues reserved to the Commissioner, for which the ALJ gave Dr. Brose's opinion no weight. R. 26–27.

In June 2017 and mid-2018, Dr. Tiwari authored several medical opinions. R. 2441–42 (June 2017 opinion); R. 4191 (March 2018 opinion); 4192–93, 4197–201 (February 2018 opinion). Dr. Tiwari's June 2017 opinion found that Dionne could participate in employment for up to 19 hours per week and that she could not lift more than 15 pounds and has difficulty with overhead lifting. R. 2441. Dr. Tiwari's March 2018 opinion reached the same conclusions expressed in her June 2017 opinion. These opinions were ultimately afforded little weight as the ALJ found them to be identical to Dr. Brose's June 2017 opinion. R. 2441–42.

Dr. Tiwari's February 2018 opinion, R. 4191–93, 4197–201, found Dionne could occasionally lift less than ten pounds and frequently lift fifty pounds or more and that her ability to push and pull were limited. R. 4198. She also concluded that Dionne could stand less than two

9

hours and sit about six hours in an eight-hour workday. R. 4198. She also concluded that Dionne had postural limitations, stating she could only occasionally climb, stoop, kneel, crouch, or crawl, and that she could never balance. R. 4199. She similarly noted that Dionne had manipulative limitations, noting limitations in her ability to reach, handle, and finger. R. 4200. Dr. Tiwari finally noted some environmental, communicative, and visual limitations. R. 4200–01. The ALJ did not attribute this opinion to Dr. Tiwari, believing it to be "unsigned," and he assigned it little weight. R. 27–28.

In January 2018, Catherine Twimasi, M.D., completed a medical evaluation form from the Virginia Department of Social Services. R. 4194–95. Dr. Twimasi's January 2018 opinion was identical to Dr. Brose's June 2017 opinion and the ALJ gave this opinion little weight. Suzanne Krzyanowski, M.D., filled out an identical form with the same restrictions. R. 4196. The ALJ gave these opinions little weight. R. 27.

In February 2018 and April 2019, Jane Nielson, LPC, authored an opinion concluding that Dionne's mental and physical conditions "restrict [her] from being able to hold down a job." R. 4176, 4771, 4773. The ALJ gave this opinion no weight as it was on an issue reserved to the Commissioner. R. 27.

In August 2017 state agency physician Wyatt Beazley III, M.D., reviewed the record and found Dionne capable of a limited range of light work, with certain exertional and postural limitations but no manipulative or environmental limitations. R. 120–23. The ALJ gave Dr. Beazley's opinion partial weight. R. 25. State agency psychologist Jo McClain, Psy.D., also reviewed the record in August 2017 and found that Dionne had no mental limitations. R. 118. The ALJ gave Dr. McClain's opinion little weight. R. 26.

State agency physician David Bristow, M.D., reviewed the record in March 2018 and found Dionne capable of medium work, with certain exertional, postural, and environmental limitations but no manipulative limitations. R. 150–55. The ALJ gave Dr. Bristow's opinion partial weight. State agency physician Andrew Bockner, M.D., also reviewed the record in March 2018 and found Dionne had no limitation in her ability to adapt or manage herself but mild limitations in her ability to understand, remember, or apply information, interact with others, and concentrate, persist, or maintain pace. R. 147. The ALJ gave Dr. Brockner's opinion little weight. R. 26.

### B. Treating Physician's Opinion

Dionne argues that the ALJ failed to properly weigh Dr. Tiwari's medical opinions, specifically her February 2018 opinion. Pl.'s Br. at 18, Dkt. 21. I agree.

The social security regulations require that an ALJ give the opinion of a treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."[8] 20 C.F.R. § 404.1527(c)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001); Brown v. Comm'r Soc. Sec. Admin., 873 F.3d 251, 269 (4th Cir. 2017) (noting that "the ALJ is supposed to consider whether a medical opinion is consistent, or inconsistent, with other evidence in the record in deciding what weight to accord the opinion"). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater,

---

[8] The social security regulations regarding the evaluation of medical opinion evidence have been amended for claims filed after March 27, 2017. See 20 C.F.R. §§ 404.1520c, 416.920c (setting out rules for claims filed on or after March 27, 2017, including that no specific evidentiary weight, including controlling weight will be given to any medical opinions). However, as this claim was filed prior to the effective date of the amended rule, I will apply the rules in 20 C.F.R. §§ 404.1527(c), 416.927.

11

76 F.3d 585, 590 (4th Cir. 1996). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Saul v. Astrue, No. 2:09–cv–1008, 2011 WL 1229781, at *2 (S.D.W. Va. March 28, 2011).

Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. §§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, No. 2:09cv622, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010).

The Fourth Circuit recently clarified the level of explanation required by the ALJ to sufficiently support the weight given to a medical opinion. Arakas v. Comm'r, 983 F.3d 83, 107 (4th Cir. 2020). The ALJ must provide a narrative discussion describing how the evidence in the record supports each of his conclusions, citing specific medical facts and non-medical evidence, which "build[s] an accurate and logical bridge from the evidence to [its] conclusion." Monroe, 826 F.3d at 189. The failure of an ALJ to specifically state what treatment history or evidence contradicts a particular medical opinion means "the analysis is incomplete and precludes meaningful review." Id. at 190. "Where a lack of specificity and analysis prohibits the district court from gleaning the evidence relied upon or the reasoning for weight afforded contradictory opinions, the district court cannot merely look to the record or conclusory statements within the opinion, but must remand the case so that the ALJ can adequately explain if and how the

evidence supports his RFC determination." Rucker v. Colvin, No. 715cv148, 2016 WL 5231824, at *4 (W.D. Va. Sept. 20, 2016) (citing Mascio, 780 F.3d at 637).

Dr. Tiwari authored three medical opinions. Two opinions, her June 2017 and March 2018 opinions, were nearly identical to opinions offered by Drs. Brose, Twimasi, and Krzyanowski. The ALJ assigned these opinions little weight, relying on the opinions' duplicative nature. R. 27; see R. 2441, 2345, 4194, 4196. Dr. Tiwari also authored a February 2018 opinion. R. 4192–93, 4197–201. The ALJ believed the opinion to be unsigned and, thus, did not identify it as Dr. Tiwari's.[9] R. 27.

The ALJ did not appropriately consider the 20 C.F.R. § 416.927 factors in reviewing any of Dr. Tiwari's opinions. See Sharp v. Colvin, 660 F. App'x 251, 257 (4th Cir. 2016) ("[The ALJ must provide] specific reasons for the weight given to the treating source's medical opinion to enable reviewing bodies to identify clearly the reasons for the ALJ's decision."); Lisa C. v. Saul, No. 7:18-cv-269, 2019 WL 3949068, at *7 (W.D. Va. Aug. 6, 2019) (ALJ must consider 20 C.F.R. §§ 404.927(c)(2)–(5) and 416.927(c)(2)–(5) factors); See Ricks v. Comm'r, No. 2:09-CV-622, 2010 WL 6621693 (E.D. Va. Dec. 29, 2010) ("None of [the factors required to be considered] may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion."). He did not discuss the length and treatment relationship between Dionne and Dr. Tiwari, the nature and extent of the treatment relationship between Dionne and Dr. Tiwari, or Dr. Tiwari's qualifications or specialization in either his review of Dionne's medical history or his analysis of the opinion evidence.[10] R. 23–28; see Christian v. Saul, No. 1:20-

---

[9] The pages of the administrative record are out of order. Dr. Tiwari's signature page, R. 4193, is located several pages before pages 1–5 of her opinion, R. 4197–201.

[10] Nor did the ALJ appropriately consider these factors for any treating physician opinion. See R. 26–28 (analyzing Drs. Brose and Huerta's opinions). While the ALJ engages in some analysis regarding these opinions' consistency with the medical record as a whole, such analysis is fairly limited. The ALJ does not identify these physicians' relationship with Dionne or their role in her treatment. Id.

13

00051, 2021 WL 1170012, at *3–4 (S.D.W. Va. Mar. 26, 2021) (remanding where ALJ only addressed two of the § 404.1527(c) factors, noting that "[the remaining factors], arguably, might have cut in [claimant's] favor"). In fact, the ALJ did not expressly identify Dr. Tiwari as a treating physician—either in his decision or at the administrative hearing. And, while Dr. Tiwari's treatment notes indicate she primarily treated Dionne's non-severe conditions, e.g. abdominal pain and diabetes, Dr. Tiwari attended to Dionne over the course of three years, between 2017 and 2019, and she saw her at numerous appointments during this time. See, e.g., R. 2459, 4717, 4729. Dr. Tiwari's physical exams revealed on several occasions that Dionne suffered some musculoskeletal weakness, pain, and reduced range of motion. Dr. Tiwari ultimately referred Dionne to physical therapy to manage these symptoms. See R. 2972, 4730.

      Had Dr. Tiwari only authored duplicate medical opinions, the ALJ's failure to consider all 20 C.F.R. § 416.927 factors would likely be harmless. See Starcher v. Colvin, No. 1:12–01444, 2013 WL 5504494, at *5 (S.D.W. Va. Oct. 2, 2013) ("It would be redundant and unnecessary to require an ALJ to recite in great detail the reasons for discounting a treating source's opinion when such reasons are identical to those already offered."); Thompson v. Colvin, No. 3:14–cv–15949, 2015 WL 5626513, at *3 (S.D.W. Va. Sept. 24, 2015 (finding ALJ made harmless error when he disregarded a treating physician's medical opinion since his "opinion was nearly identical to [another doctor's] opinion, which the ALJ properly determined was entitled to little weight."). Dr. Tiwari also authored the non-duplicated February 2018 opinion, however. The ALJ plainly did not consider all factors in analyzing this opinion as he believed the opinion to be unsigned. Failure to recognize the opinion as Dr. Tiwari's and, therefore, review each factor, is not necessarily reversible error. Bumpass v. Colvin, No. 5:14–CV–2, 2014 WL 7149738, at *5–6 (E.D.N.C. Dec. 15, 2014) (finding no reversible error where

14

ALJ did not attribute unsigned opinion to treating physician, noting that "[e]ven assuming the medical source statement [was authored by the treating physician], substantial evidence supports the ALJ's determination that [the opinion] was entitled to little weight"). The failure to engage in this analysis is not an insignificant factor, however, as the opinions of treating physicians are accorded special enhanced treatment under the Social Security regulations. SSR 96–2p; 20 C.F.R. § 416.927; see e.g., Alexander v. Colvin, No. 9:14–2194, 2015 WL 2399846 (D.S.C. May 19, 2015) (remanding where ALJ misattributed opinion as being physician assistant's and not treating physician's). This is especially so in this case where the February 2018 opinion not only contained conclusions providing support for other treating opinions in the record, see, e.g., R. 495, 4198, 4200 (describing manipulative limitations), but also contained additional conclusions and discussion regarding Dionne's manipulative and environmental limitations that were not addressed by other treating physicians in the record and are more restrictive than the limitations set forth in the RFC, see R. 4192–93, 4197–201 (Dr. Tiwari's opinion noting, for instance, that Dionne is limited in her ability to reach overhead and in all directions); cf. R. 22 (ALJ finding Dionne can frequently reach overhead and in all directions).

Even assuming the ALJ's analysis appropriately considered the factors, his reasons for giving little weight to Dr. Tiwari's February 2018 opinion are not adequately explained. The ALJ provided a limited explanation as to why he gave it little weight, specifically noting that (1) the opinion's lifting restrictions were internally inconsistent and (2) that walking restrictions were inconsistent with treatment notes stating Dionne was able to ambulate.[11]

---

[11] The ALJ correctly notes that Dionne's gait was generally described as normal in treatment notes and, elsewhere in the opinion, he referenced her generally normal musculoskeletal strength to support less restrictive walking, standing, and sitting restrictions. See R. 26–28. Still, the ALJ does not address how Dionne's ability to ambulate, or her ability to sustain such activity, may be impacted by her leg pain, back pain, or other generally complaints of numbness. See, e.g., R. 54, 2976, 3153, 4626, 4786 (leg pain); R. 2607, 2788 (numbness); R. 4610, 4678, 4733, 4786 (back pain). This lack of explanation is particularly troubling as the ALJ used Dionne's ability to ambulate to specifically discount three treating physician opinions regarding Dionne's mobility and exertional

15

While the ALJ plainly provided some review of the opinion's inconsistency with the medical evidence and the record, he did not adequately explain how an ability to ambulate undermines Dr. Tiwari's conclusions that Dionne is limited in her ability to push, pull, lift, reach, and manipulate objects. While the ALJ elsewhere notes that Dionne's treatment notes indicated full shoulder strength and range of motion, her providers consistently noted pain and associated limitations related to her shoulders and upper extremities, which the ALJ did not address in reviewing Dr. Tiwari's opinion. R. 507, 1890, 3037, 4466–68, 4634 (describing shoulder pain, tenderness, and reduced range of motion). Perhaps more problematically, the ALJ at no point in his opinion, acknowledged that each treating physician's opinion, to the extent they overlap in discussing exertional, postural, and manipulative ability, suggest similar limitations. See, R. 495–96, 4197–201, 4445 (suggesting similar exertional limitations); R. 495–96, 4197–201 (suggesting similar manipulative and postural limitations).[12]

While the ALJ is under no obligation to accept any medical opinion, he must explain the weight afforded to each opinion. "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96–8p. The ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave" to the opinion and "the reasons for that weight." SSR 96–2p. If the ALJ provides a sufficient explanation the court "must defer to the ALJ's assignments of weights

---

limitations. See, e.g., R. 26–27 (discounting Dr. Brose's findings regarding Dionne's standing and walking limitations given Dionne's ability to ambulate); R. 28 (discounting Dr. Tiwari's February 2018 findings regarding Dionne's standing and walking limitations given Dionne's ability to ambulate); R. 28 (discounting Dr. Huerta's findings regarding Dionne's mobility given Dionne's ability to ambulate).

[12] Interestingly, the ALJ gave only one medical opinion great weight (the remainder received either no or little weight). R. 26–28. This opinion, from treating physician Dr. Huerta, generally suggested that Dionne was not restricted in her activities of daily living. R. 4445. To the extent Dr. Huerta found Dionne unable to ambulate, the ALJ assigned that portion of the opinion little weight. R. 28.

unless they are not supported by substantial evidence." Dunn v. Colvin, 607 F. App'x 264, 271 (4th Cir. 2015) (citing Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012)). However, if the ALJ does not adequately explain the weight given to each medical opinion, the court cannot meaningfully review the ALJ's decision, and remand is warranted.

I find both that the ALJ failed to adequately consider the 20 C.F.R. § 416.927 factors and that his reasons for giving little weight to Dr. Tiwari's February 2018 opinion is insufficiently explained. The ALJ attempted to build a bridge from the evidence to his conclusions when weighing the medical opinion evidence in this case, but that bridge is not "accurate and logical," as required by Monroe v. Colvin.

I recognize that it is not my function to conduct a blank slate review of the evidence by reweighing conflicting evidence, determining credibility, or substituting my judgment for the ALJ's when "reasonable minds could differ." See Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012); Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). In fact, I am precluded from doing so; it is the duty of the ALJ to explain the basis for his opinion. Here, the ALJ did not appropriately consider the 20 C.F.R. § 416.927 factors and did not adequately explain his reasons for giving Dr. Tiwari's February 2018 opinion little weight. Accordingly, I conclude that substantial evidence does not support the ALJ's decision.[13]

## CONCLUSION

For these reasons set forth above, I **GRANT in part** Dionne's motion for summary judgment, **DENY** the Commissioner's motion for summary judgment this case, and **REMAND**

---

[13] Because I find that remand is warranted based on the ALJ's failure to adequately explain his decision to discount Dr. Tiwari's opinions, Dionne's additional allegations of error will not be decided. See Boone v. Barnhart, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments).

this matter to the Commissioner for additional consideration under sentence four of 42 U.S.C. § 405(g).

                Entered:  August 16, 2021

                *Robert S. Ballou*

                Robert S. Ballou
                United States Magistrate Judge